**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

MEHDI DEHGHANI, individually and derivatively on behalf of CMB COLORADO INFRASTRUCTURE INVESTMENT GROUP 41, LP,

*Plaintiff*,

vs.

CMB COLORADO REGIONAL CENTER, LLC; NK IMMIGRATION SERVICES, LLC; CMB EXPORT LLC; CMB SWISS CO GmbH; PATRICK F. HOGAN; and JOHN DOES 1–10,

*Defendants*,

– and –

CMB COLORADO INFRASTRUCTURE INVESTMENT GROUP 41, LP,

*Nominal Defendant.*

----------------------------------------------------------------x

Civ. Action No. _________

**VERIFIED COMPLAINT**

*JURY TRIAL DEMANDED*

Plaintiff Mehdi Dehghani ("Plaintiff" or "Mr. Dehghani"), individually and derivatively on behalf of nominal defendant CMB Colorado Infrastructure Investment Group 41, LP ("Group 41" or the "Partnership"), by and through his undersigned counsel, alleges as follows. Allegations concerning Plaintiff and his own acts are made on personal knowledge. All other allegations are made on information and belief, formed after a reasonable inquiry that included review of the Partnership's offering and governing documents, the general partner's written notices to limited partners, Plaintiff's capital account statements, the Partnership's loan documents, correspondence between Defendants and Plaintiff's representatives, and public records, including orders of the United States Securities and Exchange Commission ("SEC") and court filings. Plaintiff believes that substantial additional evidentiary support for these allegations will exist after a reasonable

opportunity for discovery, because the relevant facts are peculiarly within Defendants' possession and control.

## I. NATURE OF THE ACTION

1. This action arises from the management of an EB-5 investment partnership by a sponsor that the SEC sanctioned in 2018 in connection with its offering of that same partnership's securities. Mr. Dehghani, a foreign national who sold his family home to fund the investment, paid $550,000 in 2015 to become a limited partner of Group 41. Group 41 was organized, managed, and controlled by Defendant Patrick F. Hogan through affiliated entities that operate under the trade name "CMB Regional Centers" (collectively, "CMB").

2. Group 41 was marketed to Mr. Dehghani as a fund that would make two construction loans for new residential projects in Denver, Colorado. After those loans were repaid, Group 41's general partner (the "General Partner"), acting through Hogan, redeployed $21.5 million of the limited partners' capital, in June 2019, into a two-year mezzanine loan to an entity controlled by real estate developer Michael Rosenfeld, secured by a pledge of the membership interests in the owner of the Stanford Court Hotel in San Francisco (the "Hotel"), and structurally subordinate to a $105 million senior mortgage held by Deutsche Bank AG. CMB Export LLC, Hogan's affiliate and the "Agent" for the lenders, collected its own fees on the transaction.

3. When the Hotel closed in March 2020 and the borrower defaulted, the General Partner faced a choice: force a sale that its own consultant estimated would return roughly 60 percent of the Partnership's principal, or commit additional capital to the defaulted loan. A majority of the limited partners who responded to the General Partner's September 2021 survey said they wanted the Hotel sold. The General Partner, acting through Hogan, overrode that preference and chose the second course. On November 23, 2021, Hogan caused Group 41 and four

affiliated CMB partnerships to advance an additional $19,882,597.04 to Rosenfeld's borrower in a new subordinate "Tranche B," and, because the limited partners would not contribute more money, he caused the General Partner to "advance" Group 41's $7,499,576.08 share of that new money to the Partnership at 15 percent interest, repayable "before [the limited partners] receive any future distribution or return of capital" (the "GP Advance"). As a condition of that transaction, the Borrower paid CMB Export, for its own account, an origination fee of two percent of Tranche B (approximately $397,652), in addition to the administration fees to which CMB Export was entitled as Agent for each of the four loan amendments executed in 2021.

4. Defendants did not disclose to the limited partners what CMB knew about Rosenfeld when it committed the additional capital. CMB was simultaneously the $450 million junior mezzanine lender, through its affiliate CMB Export Infrastructure Investment Group 48, LP, on Rosenfeld's Century Plaza Hotel redevelopment in Los Angeles. That project's financing defaulted at maturity in July 2021, four months before the Fourth Amendment (defined below), and in April 2023 the project's senior lenders foreclosed. CMB itself had sued to stop a foreclosure sale that, a New York trial court found in an injunction later vacated on appeal, "would likely extinguish" its $450 million loan (¶ 50). Nor did Defendants disclose that losses on the money the General Partner advanced would be charged to the limited partners' capital accounts, as they later were, while the General Partner retained the right to be repaid first, creating a structure that ultimately drove those accounts below zero.

5. The independent appraisal Defendants obtained in late 2021 valued the Hotel at less than the approximately $120 million then owed on the senior loan, and the Hotel never recovered. Months before USCIS denied Mr. Dehghani's I-526 petition in May 2023, CMB had already told him that the General Partner would not seek a replacement investor or permit his withdrawal

because the Partnership's funds were "redeployed," and after the denial it refused to return his capital in the same words. On September 30, 2023, the Partnership booked a "Loss Allowance" of $676,026.33 against Mr. Dehghani's $500,000 capital account, driving it from positive $497,780.00 to negative $178,246.33. Defendants continued thereafter to debit his account for "extraordinary" financial advisory, legal, audit, and insurance expenses, and as of March 31, 2026 his account stood at negative $181,042.45. In May 2026 Hogan told the limited partners that, unless they contributed still more money so the CMB partnerships could buy Deutsche Bank's defaulted senior note, it was "almost certain" that a foreclosure "would result in CMB Lenders' position being completely wiped out." In July 2026, the General Partner conditioned limited partners' access to basic information about that proposal, including the senior loan balance, the plan, the allocation of capital, and any conflicts of interest, on their first expressing interest in funding it.

6. Plaintiff brings this action to (a) rescind his investment and recover the $550,000 he paid, under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b); Section 215 of the Advisers Act, 15 U.S.C. § 80b-15; and New York and Delaware law; (b) recover, derivatively on behalf of Group 41, the damages caused by Defendants' deceptive, self-interested securities transactions with the Partnership, and hold Hogan and CMB Export liable as control persons under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); (c) recover treble damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), 1962(d), and 1964(c); (d) recover compensatory and punitive damages for fraud, breach of fiduciary duty, aiding and abetting, breach of contract, conversion, and

conspiracy; and (e) obtain declaratory, injunctive, and other equitable relief, including an accounting, disgorgement, and the imposition of a constructive trust.

## II. JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States; under Section 27 of the Exchange Act, 15 U.S.C. § 78aa; under Section 214 of the Advisers Act, 15 U.S.C. § 80b-14; and under 18 U.S.C. § 1964(c). The Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202. The Court has supplemental jurisdiction over the state-law claims (Counts X through XVII) under 28 U.S.C. § 1367(a) because they form part of the same case or controversy as the federal claims.

8. This Court has personal jurisdiction over each Defendant. Section 27 of the Exchange Act and Section 214 of the Advisers Act authorize nationwide service of process, and each Defendant has sufficient contacts with the United States as a whole. As to the RICO claims, personal jurisdiction is established as to Group 41 and its general partners, which consented to jurisdiction in New York County as described below, and the ends of justice require that the other Defendants be brought before this Court under 18 U.S.C. § 1965(b), because all Defendants participated in a single scheme directed by Hogan and, upon information and belief, no other district has personal jurisdiction over all of them, because CMB GmbH, a Swiss company, is not subject to jurisdiction in the courts of any State (see below). *See PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998); *see also Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 413 (S.D.N.Y. 1998). In addition, in the Escrow Agreement and (subject to its arbitration provision) the Subscription Agreement that govern Plaintiff's investment, each executed on behalf of Group 41 and both co-general partners by Hogan, the parties "irrevocably submit[ted] to the nonexclusive jurisdiction of any United States Federal or State Court of competent jurisdiction

having situs in New York County, New York," agreed that claims "arising out of or relating to" those agreements "shall be commenced, heard, and determined" in such a court, and "irrevocably and unconditionally waive[d] any objection to the laying of venue" there, including any claim of inconvenient forum. Alternatively, the Court has personal jurisdiction over CMB GmbH under Federal Rule of Civil Procedure 4(k)(2), and over each Defendant as to the state-law claims under the doctrine of pendent personal jurisdiction, because those claims arise from the same nucleus of operative fact as the federal claims.

9. Venue is proper in this District under Section 27 of the Exchange Act, Section 214 of the Advisers Act, 18 U.S.C. § 1965(a), and 28 U.S.C. § 1391(b) and (c), including § 1391(c)(3) as to CMB GmbH, which does not reside in the United States, and by virtue of the parties' contractual consent to venue in courts sitting in New York County. Defendants and their affiliates transact business in this District, including by prosecuting litigation in New York County Supreme Court on behalf of CMB partnerships concerning Rosenfeld's Century Plaza project (Index No. 653821/2022), and the guaranties of the Senior Loan on the Hotel described below are the subject of litigation pending in New York County Supreme Court (Index No. 659459/2024).

10. In connection with the acts alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the United States mails, interstate and international wire communications, and electronic document portals (including the "ShareFile" portal through which the general partner delivered notices and capital account statements to limited partners).

## III. THE CLAIMS ASSERTED ARE NOT SUBJECT TO ARBITRATION

11. The Limited Partnership Agreement of Group 41 dated June 23, 2015 (the "LPA"), which defines the General Partner's powers and duties, the limited partners' rights, the Annual

Management/Operational Fees, the General Partner's 20 percent profits interest, and the limited partners' withdrawal rights, contains no arbitration clause. Neither does the Escrow Agreement. Both the Escrow Agreement and the Subscription Agreement instead provide for jurisdiction and venue in state and federal courts in New York County.

12. Section I of the Subscription Agreement is limited to "disputes arising in connection with this Agreement between the parties" (the Subscription Agreement itself) and expressly provides that "any disputes involving the claims of third parties shall not be subject to the provisions of this paragraph." The claims in this action arise principally under federal statute and from the General Partner's performance of the LPA and of the Partnership's 2019–2021 loan transactions, years after the Subscription Agreement was fully performed. The derivative claims belong to Group 41, and the RICO and control-person claims are asserted against persons who are not parties to the Subscription Agreement. A federal court construing a materially identical CMB arbitration clause has held that it does not reach claims arising from the general partner's conduct under the limited partnership agreement. *Hui Cai v. CMB Export LLC*, No. CV 22-02025-MWF (JPRx), slip op. at 5-9 (C.D. Cal. Dec. 5, 2022) (Dkt. No. 44) (denying CMB Export LLC's motion to compel arbitration because "the plain language of the Arbitration Clause here refers only to the Subscription Agreement"), *appeal docketed*, No. 25-2905 (9th Cir. 2025). Even if the Court were to conclude that any claim against the Partnership relating to Plaintiff's subscription falls within Section I, that conclusion would not reach the claims against the non-signatory Defendants, the Partnership's derivative claims, or the claims arising from the LPA and the Redeployment Loan documents, all of which should proceed in this Court.

13. Section I applies only to disputes "between the parties" to the Subscription Agreement; namely, Plaintiff and the Partnership. CMB Export, CMB GmbH, and Hogan are not

parties to it, and Section I's carve-out for "disputes involving the claims of third parties" confirms that the parties did not agree to arbitrate disputes in which non-parties' claims or liabilities are at issue. This entire dispute involves such claims, including the Partnership's own derivative claims and claims against non-signatories. Hogan, CMB Export, and CMB GmbH cannot invoke Section I: the claims against them are not founded in or intertwined with the Subscription Agreement, but arise under the federal securities and racketeering laws, the LPA, and the Redeployment Loan documents, none of which contains an arbitration provision.

14. The integrated agreements direct claims arising out of or relating to them to the courts of New York County, and Section I's narrow arbitration clause cannot displace them; at a minimum, the agreements' dispute-resolution provisions conflict. The Subscription Agreement states that it, the LPA, and the Escrow Agreement "constitute the entire agreement among the parties"; the Escrow Agreement requires, and Section H of the Subscription Agreement (which is made "[s]ubject to" Section I) provides, that all claims "arising out of or relating to" them "be commenced, heard, and determined" in state or federal court in New York County; and the LPA contains no arbitration provision at all. Any ambiguity created by these provisions, which Defendants drafted, must be construed against them and against a finding that Plaintiff clearly agreed to arbitrate the claims asserted here.

## IV. THE PARTIES

### A. Plaintiff

15. Plaintiff Mehdi Dehghani is a citizen of the Islamic Republic of Iran and, since 2026, of the Federal Republic of Germany, and resides in Marburg, Germany. He resided in Tehran, Iran when he invested in Group 41 and has resided in Germany since July 2016. He made the investment hoping to immigrate to the United States with his wife and son and to build a new

life near his wife's family and his brother, who live there. In November 2015 Mr. Dehghani subscribed for one unit of limited partnership interest in Group 41 for a total subscription price of $550,000, consisting of a $500,000 capital contribution and a $50,000 "Syndication Price." He was admitted as a limited partner effective as of December 9, 2015, and has continuously held his limited partnership interest from that date through the present, including at the time of each transaction challenged herein.

**B. Defendants**

16. Nominal Defendant and Defendant CMB Colorado Infrastructure Investment Group 41, LP is a Delaware limited partnership whose Certificate of Limited Partnership was filed on September 25, 2014. Its principal office has been at 7819 42nd Street West, Rock Island, Illinois 61201, and it has also conducted business through CMB's offices at 5910 N. Central Expressway, Suite 1000, Dallas, Texas 75206. Group 41 raised $21.5 million from 43 limited partners. Group 41 is named as a nominal defendant with respect to the derivative claims and as a defendant with respect to the claims for rescission and declaratory relief, as a party to the contracts at issue.

17. Defendant CMB Colorado Regional Center, LLC ("CMB Colorado") has been a general partner of Group 41 at all relevant times and, since December 30, 2019, its sole general partner. The Partnership's Confidential Private Placement Memorandum dated July 27, 2015 (the "PPM") describes CMB Colorado as a Delaware limited liability company; the Partnership's 2021 loan documents describe it as a Texas limited liability company. Hogan is its Manager.

18. Defendant NK Immigration Services, LLC ("NK") is a limited liability company that the PPM describes as organized under Illinois law and that a February 10, 2020 notice to the limited partners describes as a Texas limited liability company. Hogan is its Manager. NK was a co-general partner of Group 41 when Plaintiff invested and remained one until December 30, 2019,

when it withdrew and CMB Colorado became the sole general partner; according to that notice, because Hogan managed both entities, the withdrawal caused "no change in management or ownership of the General Partner." As used herein, the "General Partner" refers to CMB Colorado and NK collectively through December 30, 2019, and to CMB Colorado thereafter. Claims against NK premised on its status as a general partner arise from conduct through December 30, 2019; NK's liability as a member of the conspiracies alleged in Counts VIII and XVII is not so limited.

19. Defendant CMB Export LLC ("CMB Export") is a Texas limited liability company headquartered at 5910 N. Central Expressway, Suite 1000, Dallas, Texas 75206, with offices at 7819 42nd Street West, Rock Island, Illinois 61201. Hogan is its Manager. The PPM describes CMB Export as a California limited liability company formed in 1997; the Partnership's 2021 loan documents describe it as a Texas limited liability company. The "Management" section of the PPM presented, in addition to Hogan, three officers of CMB Export: its Senior Vice President for Worldwide Operations, its Vice President of Company Operations, and its Vice President of CMB Asia Market. CMB Export is the general partner or affiliate of the general partner of dozens of other CMB investment partnerships, served as "Agent" for Group 41 and the other CMB lenders under the Stanford Court Hotel redeployment loan, and received fees for its own account in connection with that loan. In a September 2018 settled order, the SEC found that CMB Export, in connection with offerings by CMB partnerships including Group 41, caused violations of Section 15(a)(1) of the Exchange Act and ordered CMB Export to pay a civil penalty of $5,150,000.

20. Defendant CMB Swiss Co GmbH ("CMB GmbH") is a limited liability company organized under the laws of Switzerland and an affiliate of the General Partner. Under the Subscription Agreement and Escrow Agreement, CMB GmbH received the $50,000 Syndication Price paid by Plaintiff and by each other Group 41 investor, which, according to the PPM, CMB

GmbH could use, in its "absolute and sole discretion," to cover "costs of operation and possible profit," to act as a "foreign sourcing entity for prospective Investors," and "to support CMB GmbH's foreign finder network," including through "referral agreements," without disclosing who would be paid, how much, or on what basis. Upon information and belief, CMB GmbH is managed and controlled by Hogan and CMB Export. In 2023, Azam Firouzi, who solicited Plaintiff's investment (¶ 30), corresponded with Plaintiff as CMB GmbH's "Executive Director" from its offices in Schaffhausen, Switzerland.

21. Defendant Patrick F. Hogan is a natural person who, on information and belief, resides in Illinois or Texas. At all relevant times Hogan was the Manager of CMB Colorado, NK, and CMB Export and the President of CMB Regional Centers, and he signed the Partnership's offering documents, the Stanford Court Hotel loan agreement and its Fourth Amendment on behalf of each CMB lender and the Agent, and the general partner's notices to the limited partners as "Manager of the General Partner." Hogan directed and controlled the Partnership, the General Partner, and CMB Export. In the same settled order, the SEC found that Hogan caused violations of Section 15(a)(1) of the Exchange Act in connection with CMB partnership offerings including Group 41's, and ordered him to pay a civil penalty of $515,000.

22. Defendants John Does 1–10 are persons and entities, including officers, employees, affiliates, and agents of CMB, whose identities are presently unknown to Plaintiff and who participated in, directed, or knowingly assisted the conduct alleged herein. Plaintiff will amend this Complaint to name them when their identities are ascertained.

23. CMB Colorado, NK, CMB Export, CMB GmbH, Hogan, and John Does 1–10 are referred to collectively as the "Defendants" or the "CMB Defendants." Where a Count is asserted against Group 41, it is included within "Defendants" for purposes of that Count. Within each

Count, "Defendants" refers only to the Defendants against whom that Count is asserted, and each Count identifies the conduct of each such Defendant on which it is based.

### C. Relevant Non-Parties

24. SCH Associates, LLC ("SCH" or the "Borrower") is a Delaware limited liability company formed to own Pine & Powell Partners, LLC (the "Property Owner"), which owns the Stanford Court Hotel at 905 California Street, San Francisco, California (the "Hotel"), a 400-room hotel on Nob Hill. Michael Rosenfeld, through Woodridge Capital Partners, controls SCH and is designated in the loan documents as the "Sponsor."

25. CMB Texas Infrastructure Investment Group 40, LP; CMB Export Infrastructure Investment Group XVII, LP; CMB Texas Infrastructure Investment Group 20, LP; and CMB Pennsylvania Infrastructure Investment Group 33, LP are CMB investment partnerships controlled by Hogan that, together with Group 41, are the lenders under the Stanford Court Hotel redeployment loan (with Group 41, the "CMB Lenders"). According to the General Partner, the five CMB Lenders had a combined 269 limited partners.

26. CMB Export Infrastructure Investment Group 48, LP ("Group 48") is a CMB investment partnership controlled by Hogan that provided a $450 million junior mezzanine loan for Rosenfeld's redevelopment of the Century Plaza Hotel in Century City, California.

## V. SUBSTANTIVE ALLEGATIONS

### A. CMB and the EB-5 Program

27. The EB-5 Immigrant Investor Program permits a foreign national who invests a qualifying amount in a "new commercial enterprise" that creates at least ten full-time jobs for U.S. workers to petition, on Form I-526, for conditional lawful permanent residence. Under USCIS policy, the investor's capital must remain "at risk" throughout a sustainment period. EB-5 investors

are, by definition, foreign nationals who are dependent on the sponsor for information about the investment and who face immigration consequences if they withdraw.

28. Hogan built CMB into one of the largest EB-5 sponsors in the United States. CMB's 2015 marketing brochure, distributed to Mr. Dehghani in connection with his investment, represented that CMB would have "over 4,400 investors" and would raise "over $2.4 Billion in EB-5 Capital" once its partnerships were subscribed, and it touted a record of "100% approval" of I-526 petitions in its earlier partnerships. The same brochure featured "Group 48 – Century Plaza (2015)" (a $450 million, 900-investor offering) and stated that Rosenfeld had grown Woodridge Capital Partners "to become one of the top developers, owners and manager of real estate assets."

29. CMB's model is to form a separate limited partnership for each offering, with one or more CMB-affiliated entities as general partner and Hogan as Manager of each general partner. Each partnership pools investor capital and lends it to a third-party developer. The general partner controls when and where the partnership's capital is invested and reinvested, within the limits the partnership agreement imposes, and the general partner and its affiliates are compensated out of the interest the partnership earns, out of fees paid by borrowers, and out of a share of partnership profits.

**B. Plaintiff's Investment in Group 41**

30. The CMB investment was introduced and recommended to Mr. Dehghani by an EB-5 investment adviser to whom he paid consulting fees, and by Azam Firouzi, whose business card identified her (in translation from Persian) as CMB's "EB-5 Immigration Affairs Manager" and bore the "CMB Regional Centers" name and seal, CMB's Rock Island, Illinois office address, and the email address afirouzi@cmbeb5visa.com. On November 14, 2015, six days before he subscribed, Ms. Firouzi met with Mr. Dehghani at his office in Tehran, where he then lived, and

presented the CMB investment to him using CMB's Persian-language and English-language marketing brochures. At that meeting, Mr. Dehghani specifically asked Ms. Firouzi whether his principal would be refunded if his I-526 petition were denied, and she told him that it would be returned. The same day, Ms. Firouzi sent Mr. Dehghani an email titled "CMB RCs- follow up Meeting in Tehran," attaching both brochures. Page 20 of each brochure addressed the return of the investor's capital in the event of an I-526 denial, and the English-language brochure expressly stated that the investor's syndication fee would be refunded as well. Mr. Dehghani's decision to invest was based primarily on Ms. Firouzi's explanations, including her assurance that his principal would be returned if his petition were denied, and on the Persian-language brochure. That assurance was an important factor in his decision. Upon information and belief, Ms. Firouzi acted on behalf of CMB Export and of CMB GmbH, which the PPM designated a "foreign sourcing entity for prospective Investors"; by 2023 she was CMB GmbH's Executive Director. The Persian-language brochure, which CMB published in February 2015, stated, among other things (in translation): (a) that "in the event the I-526 petition is denied, the investor's capital and any profit it has earned during this period will be returned to the investor"; (b) that CMB's investments "have financial transparency" and rest on a foundation "focused on the investor's goals, not only on the regional center's goals"; and (c) in its disclaimer, that the investment units were offered within the United States under the exemption from registration in Section 4(2) (now Section 4(a)(2)) of the Securities Act. On November 20, 2015, he executed the Subscription Agreement, the signature page to the LPA, the Escrow Agreement, and a form acknowledgment of receipt of the PPM, and he wired the $550,000 subscription price to the Partnership's account at First Midwest Bank, ABA No. 071901604, for further credit to his name. The Partnership accepted the subscription and admitted him as a limited partner, crediting his capital account with $500,000 as of December 9,

2015. The $50,000 Syndication Price was released to CMB Swiss Co GmbH, a Swiss affiliate of the General Partner, which, under the PPM, could use it to support CMB's "foreign finder network," without disclosing who would be paid, how much, or on what basis.

31. The PPM stated that Group 41 "is a new commercial enterprise that will use the proceeds of this offering to make two separate loans for the development and construction of two separate multi-unit residential developments in the City of Denver, Colorado": a loan of up to $22,000,000 for an eighteen-story, 274-unit rental project at 1250 Cherokee Street (the "Cherokee Project") and a loan of up to $2,500,000 for a four-story, 108-unit mixed-income project (the "Chestnut Project").

32. The PPM stated that the loans would bear interest at 6.5 percent; that the General Partner would be paid "Annual Management/Operational Fees" equal to the greater of (a) all interest received by the Partnership minus one percentage point or (b) 5.5 percent of the limited partners' total capital contributions, "regardless of when the Partnership is terminated or dissolved"; that the General Partner would in addition be paid "twenty percent (20%) of the net profits and distributable income of the Partnership"; and that CMB Colorado would receive document preparation and facility fees from the borrowers. As a result, the limited partners' expected return was "not expected to exceed approximately 0.8% per year." Mr. Dehghani's capital account statements reflect that, from 2016 through 2020, $2,941.22 was deducted from his allocated income as the 20 percent profit share, recorded in 2016 as "20% Distribution Income to CMB Export" and thereafter as "20% Distributable Income to General Partner."

33. The LPA gave the General Partner "full, exclusive, and complete discretion, power, and authority, to manage, control, administer, and operate the business and affairs of the Partnership," including the investment and reinvestment of the Partnership's capital. At the same

time, the LPA provides that the General Partner has "no authority to cause the Partnership to engage in" "[t]he alteration of the primary purpose or business of the Partnership" without the affirmative written vote or consent of the "Required Majority" of the limited partners (those holding more than 50 percent of the Percentage Interests), and permits limited partners holding more than 30 percent of the percentage interests to call a meeting "to consult with and advise the General Partner with respect to the financial matters and operation of the business of the Partnership." The PPM acknowledged that, "[u]nder Delaware law, the General Partner is accountable to the Limited Partners as a fiduciary."

34. The PPM told investors that "the Partnership believes that the Units likely do not constitute 'securities' under the U.S. federal securities laws." The PPM mentioned, only deep in its risk factors, that the SEC had subpoenaed CMB Export in December 2012 in connection with the offer and sale of units of two CMB partnerships, but stated that "CMB has not had any additional contact from the SEC on this non-public inquriy [*sic*]."

35. These statements were materially false and misleading when made. The statement that the units were "likely" not securities was an opinion that Defendants did not genuinely hold, as the PPM itself shows: on its second page, it stated that the Partnership intended the offering to "satisfy the requirements of an exempt offering to 'accredited investors' in a private placement under Rule 506 of Regulation D" and to comply with "the Regulation S safe harbor under the Securities Act," exemptions that exist only for offerings of securities, and CMB's Persian-language brochure likewise invoked a securities-law registration exemption (¶ 30). The opinion also omitted material facts about its basis, see *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015); *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016): the units were interests in a pooled, passively held investment vehicle whose returns

depended entirely on the General Partner's efforts. The statement served to discourage investors from recognizing and asserting their rights under the securities laws. The statement that CMB had had no further contact with the SEC conveyed that the inquiry was dormant and immaterial, while concealing that CMB Export and Hogan had been, during the 2011-2015 period in which Group 41 was offered, paying unregistered U.S.-based referrers transaction-based compensation for soliciting foreign investors in CMB offerings, including Group 41's; the very conduct for which the SEC later sanctioned CMB Export, Hogan, and Group 41 itself. The PPM likewise failed to disclose that the offering lacked a valid exemption from registration, exposing the Partnership and its limited partners to regulatory liability, including the $160,000 penalty later imposed on Group 41. The Persian-language brochure's statement that an investor's capital "will be returned" if the I-526 petition is denied, the English-language brochure's corresponding statement that the investor's capital and syndication fee would be refunded, and Ms. Firouzi's oral assurance to the same effect (¶ 30) were likewise false and misleading. For Group 41, the LPA conditioned any return of capital or of the Syndication Price after a denial on the General Partner's obtaining a replacement investor, allowed the General Partner, if it did not, to refuse withdrawal in its "sole discretion," and forfeited to the General Partner any capital account balance above the $500,000 contribution (Article VIII, Section H(2)); and each investor's $500,000 was released from escrow to the Partnership upon his acceptance as a limited partner (as the Partnership's audited financial statements confirm), years before his I-526 petition could be adjudicated. The same brochure's disclaimer, which described the units as offered under the exemption in Section 4(2) (now Section 4(a)(2)) of the Securities Act, shows that CMB itself treated the units as securities when it marketed them, contrary to the PPM's opinion that they were "likely" not securities.

36. The PPM also failed to disclose who would be paid to solicit investors, how much, or on what basis. Upon information and belief, persons who introduced and recommended Group 41 to Plaintiff, including Ms. Firouzi and one or more U.S.-based persons, received compensation from CMB, directly or through CMB GmbH, contingent on his investment. This belief is based on the SEC's findings that, between 2011 and 2015, CMB Export and Hogan paid U.S.-based referrers transaction-based compensation for soliciting foreign investors in CMB offerings, including Group 41's, on one or more occasions to foreign bank accounts; on the PPM's disclosure that CMB GmbH would use each investor's $50,000 Syndication Price to support its "foreign finder network," including through "referral agreements"; and on the facts that Ms. Firouzi, who solicited Plaintiff, held herself out as a CMB representative and later served as CMB GmbH's Executive Director, and that his Syndication Price was paid to CMB GmbH. That compensation, and the conflicts of interest it created for the persons on whose recommendations Plaintiff relied, were never disclosed to him.

37. Mr. Dehghani's Investor Questionnaire stated that his "primary investment objective is to obtain a permanent EB-5 visa," that he had never before purchased securities in a private placement, and that he did not maintain an account with a securities brokerage firm. Defendants knew that he was a foreign investor with no prior experience in U.S. private placements who would rely on the General Partner for information about, and the management of, his investment.

### C. The SEC Finds That Group 41's Offering Violated the Securities Laws

38. On September 21, 2018, the SEC entered a settled cease-and-desist order against CMB Export, Hogan, and 37 CMB limited partnerships, expressly including Group 41. *In re CMB Export, LLC*, Securities Act Release No. 10559, Exchange Act Release No. 84264, Admin. Proc.

File No. 3-18825 (Sept. 21, 2018). The SEC found that, between 2011 and 2015, CMB Export and Hogan entered into agreements with U.S.-based individuals and entities to refer foreign investors to CMB partnerships and paid them transaction-based compensation (on one or more occasions to foreign bank accounts, although the referrer was U.S.-based) and that CMB Export and Hogan thereby caused those referrers' violations of Section 15(a)(1) of the Exchange Act. *Id.* ¶¶ 43-45. The SEC further found that each partnership, including Group 41, offered EB-5 securities without registering the offerings and lacking a valid exemption from registration, in violation of Sections 5(a) and 5(c) of the Securities Act of 1933. *Id.* ¶¶ 2, 37, 46-47. The SEC ordered CMB Export to pay a $5,150,000 penalty, Hogan to pay a $515,000 penalty, and each partnership, including Group 41, to pay a $160,000 penalty. *Id.* § IV.B.

39. Group 41's limited partnership interests are "securities": they are interests in a pooled investment vehicle whose investors contributed money in expectation of a return of capital and interest derived entirely from the General Partner's managerial efforts. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). The SEC treated them as securities in its order.

### D. The General Partner Redeploys the Partnership's Capital Into a Mezzanine Loan to Rosenfeld

40. Group 41's initial loan was repaid in installments between October 2018 and April 2, 2019. In the notices announcing those repayments, the General Partner told the limited partners only that the Partnership would "use its reasonable efforts to reinvest" the repaid funds. On June 12, 2019, without seeking the vote or consent of the limited partners (none of the General Partner's 2019 notices in Plaintiff's possession requested it), the General Partner caused Group 41 to lend $21,500,000 (substantially all of the Partnership's capital) to SCH under a Redeployment Loan Agreement among SCH, CMB Export as "Agent," and three CMB partnerships (later five), as

lenders (as amended, the "Redeployment Loan"). Group 41 provided the largest share, 37.72 percent, of the $57,000,000 loan.

41. The Redeployment Loan bore a fundamentally different character and risk profile than the investment described in the PPM. Instead of construction lending for new residential developments in Colorado, backed by developer payment and completion guaranties, it was a two-year mezzanine loan on an existing luxury hotel in San Francisco, secured by a pledge of the membership interests in the Property Owner and subordinate to a $105 million senior mortgage loan from Deutsche Bank AG (the "Senior Loan") that matured on June 11, 2021. Hogan signed the Redeployment Loan Agreement on behalf of every CMB lender and on behalf of CMB Export as Agent.

42. Under the Redeployment Loan Agreement, CMB Export was entitled to, and upon information and belief received, fees for its own account, including a $75,000 "Document Preparation Fee" and a "Facility Fee" equal to one percent of the loan principal ($570,000), and was entitled to an "administration fee" of at least $25,000 for each material modification of the loan and an extension fee of $25,000. Those fees were payable by the Borrower in connection with a loan that was funded entirely with the capital of limited partners such as Mr. Dehghani, who bore the entire risk of loss and shared in none of the fees.

43. The redeployment served CMB's interests, not the Partnership's. Rosenfeld was not a stranger to CMB: CMB's own 2015 marketing materials touted multiple "CMB-Woodridge partnerships," including the $450 million Group 48 Century Plaza offering, by far the largest offering featured in those materials. Upon information and belief, based on those materials and on Group 48's $450 million loan to Rosenfeld's Century Plaza project, by 2019 CMB had placed hundreds of millions of dollars of its investors' capital with Rosenfeld's projects and had a strong

institutional interest in maintaining and expanding that relationship. Upon information and belief, the General Partner did not disclose the redeployment to the limited partners until 2020, after it had occurred (the earliest notice in Plaintiff's possession that describes it, dated July 20, 2020, refers back to an update dated March 25, 2020), and it did not disclose CMB Export's fees on the loan until it circulated the loan agreement with its December 27, 2021 notice. Although a January 14, 2021 notice identified the borrower as "an affiliate of Woodridge Capital Partners," the General Partner has never disclosed that Woodridge's principal had defaulted on CMB's $450 million Century Plaza loan.

44. The redeployment of the Partnership's capital into a subordinated hotel loan in California altered the primary purpose and business of the Partnership, which the LPA prohibited without the approval of the Required Majority of the limited partners. No such approval was sought or obtained. In the alternative, to the extent the LPA permitted the General Partner to reinvest repaid capital, it required that any reinvestment be "consistent with the business and purpose of the Partnership," and it did not authorize the General Partner to commit the Partnership's entire capital to a subordinated hotel loan that generated fees for the General Partner's affiliate.

### E. The Borrower Defaults and the General Partner Commits More Capital Over the Limited Partners' Stated Preference

45. The Hotel closed in March 2020. The Borrower failed to pay interest to the CMB Lenders for the fourth quarter of 2020 and the first quarter of 2021, and failed to repay the Redeployment Loan at its June 12, 2021 maturity. The Senior Loan also went into default.

46. On September 14, 2021, the General Partner sent the limited partners a notice and survey. It stated that the CMB Lenders' "consultant" estimated that a sale of the Hotel would bring a gross price of $130 to $160 million and that, after repayment of the Senior Loan, "the net proceeds would only realize approximately 60% or less of the $57,000,000 principal of the CMB

Mezzanine loan," or about $12,900,000 of Group 41's $21,500,000 loan. It proposed, in the alternative, that the CMB Lenders lend the Borrower approximately $20 million more, of which Group 41's share would be $7,544,000, or "$175,442 per limited partner." The notice stated that additional lending "may permit the Partnership to receive a full repayment of the Loan" if the Hotel recovered to a value "close to the stabilized value of $242 million, as determined in the 2019 pre-pandemic appraisal."

47. The September 14, 2021 notice told the limited partners that if they did not contribute the new money themselves, the General Partner could "contribute $7,544,000 towards such additional loan," which "will need to be repaid by the Partnership before [the limited partners] receive any future distribution or return of capital," and that "as consideration for the General Partner to make such an advance, the General Partner will receive 15% interest." The notice stated: "This is not a vote as the ultimate decision is the sole responsibility of the General Partner."

48. Neither the September 14, 2021 notice nor any other communication to the limited partners before the Fourth Amendment closed disclosed material facts that Hogan and the CMB entities he managed knew, including that:

a. Rosenfeld, the Sponsor of the Borrower to whom the General Partner proposed to lend more money, was, at the same time, the developer of the Century Plaza Hotel redevelopment in Los Angeles, on which CMB's affiliate Group 48 was the $450 million junior mezzanine lender; that the Century Plaza financing had failed to be repaid at its maturity in July 2021; and that Group 48's $450 million position was in serious jeopardy;

b. appraisals and broker opinions that Defendants commissioned and received before the Fourth Amendment closed valued the Hotel "as is" at only

$117,100,000 (Jones Lang LaSalle) or $125,000,000 (Eastdil Secured), less than or barely more than the approximately $120.2 million then owed on the Senior Loan, meaning that the Partnership's existing $21.5 million position was already effectively unsecured and that any new money would be lent behind more than $120 million of senior debt;

c. CMB Export would be paid, for its own account, an origination fee equal to two percent of any new tranche and administration fees for each loan modification, so that CMB and Hogan would profit from the decision to lend more regardless of whether the Partnership ever recovered a dollar;

d. the Borrower would not be required to pay current interest on the new tranche unless and until the Hotel achieved a debt service coverage ratio of 1.2, so that the 15 percent interest the Partnership would owe the General Partner would accrue whether or not the Borrower ever paid anything; and

e. although a GP Advance would be repaid ahead of the limited partners, any loss on the new tranche funded by the GP Advance would be charged to the limited partners' capital accounts, so that those accounts could be driven below zero while the General Partner retained a senior claim on any recovery.

49. The General Partner first disclosed the JLL and Eastdil valuations, and (in an attachment) CMB Export's origination fee, on December 27, 2021 – after the Fourth Amendment had closed and the limited partners could no longer act to prevent it. It has never disclosed the facts described in clauses (a) and (e).

50. CMB's own litigation reflects the materiality of the Century Plaza facts. In 2022, Group 48 sued the Century Plaza senior mezzanine lenders in New York County Supreme Court, alleging that it had been fraudulently induced to agree to amendments to the Century Plaza intercreditor arrangements. *CMB Export Infrastructure Investment Group 48, LP v. Motcomb Estates, Ltd.*, Index No. 653821/2022 (Sup. Ct. N.Y. Cnty.). In February 2023, the trial court enjoined a UCC foreclosure sale, finding that the sale "would likely extinguish" Group 48's "$450 million loan." 2023 NY Slip Op 30600(U), at 4 (Sup. Ct. N.Y. Cnty. Feb. 28, 2023). In January 2024, the Appellate Division, First Department, vacated the injunction, holding that Group 48 had not shown a likelihood of success and that the threatened loss of its investment could be compensated in money damages, and granted the senior mezzanine lenders' motion to dismiss Group 48's complaint as against them. 223 A.D.3d 513 (1st Dep't 2024). The Century Plaza senior lenders foreclosed in April 2023. CMB's decision to litigate, and to post a $5 million bond to delay the foreclosure, reflects how much was at stake for CMB on Rosenfeld's project. Upon information and belief, by the time of the September 14, 2021 notice, Hogan and the CMB entities he managed knew that Rosenfeld's Century Plaza project was in default and that Rosenfeld was unable or unwilling to perform his obligations on that project. This belief is based on the facts that Group 48, the partnership through which, according to CMB's 2015 brochure, CMB "committed to provide funding" for the Century Plaza project, is a CMB partnership controlled by Hogan; that Group 48's loan was not repaid when the Century Plaza financing matured in July 2021; and that a lender necessarily knows whether its own loan was repaid at maturity. A reasonable limited partner deciding whether to oppose a further $20 million loan to Rosenfeld, or to exercise the limited partners' rights to call a meeting, withhold consent to a change in the Partnership's

business, or seek judicial relief, would have considered it highly important that the sponsor was facing the loss of $450 million of its own investors' money on another Rosenfeld project.

**F. The November 23, 2021 Fourth Amendment and the GP Advance**

51. Only 37 of the 269 limited partners of the five CMB Lenders responded to the survey, and "a majority of the limited partners that responded indicated that they wanted the Hotel to be sold." The General Partner overrode that preference. In presenting the sale option on September 14, 2021 as a recovery of approximately 60 percent of the CMB Lenders' principal, the General Partner did not disclose the constraint it later cited, on December 27, 2021, as its reason for rejecting a sale: that forcing one would first require the CMB Lenders to pay off approximately $120.2 million of matured senior debt.

52. On November 23, 2021, Hogan, signing for Group 41, for each of the four other CMB Lenders, and for CMB Export as Agent, executed the Fourth Amendment to Redeployment Loan Documents (the "Fourth Amendment"). Under the Fourth Amendment: (a) the CMB Lenders advanced an additional $19,882,597.04 to the Borrower as a new "Tranche B," of which Group 41's share was $7,499,576.08, bearing interest at 15 percent; (b) all accrued but unpaid interest on the original loan was capitalized, increasing the aggregate loan to $81,526,513.71, of which Group 41's share was $30,751,228.85; (c) the CMB Lenders agreed to defer receipt of interest unless and until the Hotel achieved a 1.2 debt service coverage ratio; (d) the maturity of the Redeployment Loan was extended to be coterminous with the Senior Loan, which was extended to November 1, 2024; and (e) as a condition precedent, the Borrower paid to CMB Export, "for its own account, an origination fee in an amount equal to two percent (2%) of the aggregate principal amount of Tranche B," approximately $397,652. Of the new money, approximately $14.98 million went to bring the Senior Loan current, fund a one-year interest reserve, and pay property taxes and

payables, payments that principally benefited the senior lender and the Borrower rather than reducing the Partnership's exposure.

53. Because no limited partner had volunteered to contribute additional capital, the General Partner "advanced the necessary funds to cover the Partnership's portion of the additional required capital," on the terms described in the September 14, 2021 notice: 15 percent interest, payable by the Partnership to the General Partner, and repayable before any distribution or return of capital to the limited partners. The General Partner's decision to make the GP Advance, and the terms of the Fourth Amendment, were not disclosed to the limited partners until a notice dated December 27, 2021, after the Fourth Amendment had closed. That notice, which Hogan signed as "Manager of the General Partner," asserted that "the interest rate charged to the Borrower will offset the interest that the Partnership owes the general partner for its advance of the funds," a statement that was materially misleading because, under the Fourth Amendment the General Partner had just negotiated, the Borrower was not required to pay interest on Tranche B unless and until the Hotel reached a 1.2 debt service coverage ratio, which it never did (the Partnership has reported no income since the first quarter of 2022) while the Partnership's obligation to the General Partner accrued unconditionally. The Partnership's financial statements for the year ended December 31, 2025, which are accompanied by an independent auditor's report dated October 14, 2026 (the "2025 Financial Statements"), confirm that "the borrower failed to make certain quarterly interest payments in 2021" and that the Partnership's note "had been placed on nonaccrual status in 2021," the status the Partnership's accounting policy assigns when a note "is considered delinquent."

54. In the same notice, the General Partner offered the limited partners of the CMB Lenders the opportunity to make unsecured "Partner Loans" to the Partnership at 15 percent

interest, "deferred until the SCH Loan is repaid in full," with "a higher priority of repayment before any distributions to[] the Limited Partners," the proceeds of which "will be used to reimburse the general partner for its advance to the Partnership."

55. Defendants stood on both sides of the GP Advance and collected fees on multiple sides of the Fourth Amendment. As Agent and fee recipient, CMB Export was paid by the Borrower to approve the new money. As lender of the GP Advance, the General Partner acquired a 15 percent, priority claim against the very partnership it managed. As manager of all five CMB Lenders and of the Agent, Hogan controlled the decision. The limited partners, who had no vote and no information about Rosenfeld's Century Plaza default, bore the risk. The General Partner also stood to collect more fees. Under Article VI, Section H of the LPA, its Annual Management/Operational Fees equal the greater of 5.5 percent of the limited partners' total initial capital contributions or "the total dollar value of the interest amount which accrues to the Partnership" under its loan agreements, less an amount representing one percentage point of the interest the Partnership actually receives, and the LPA deducts those fees from any repayment of the Partnership's loans before it becomes "Cash Flow from Return of Investments" available to the limited partners. The Fourth Amendment's quarterly compounding of deferred interest and its new 15 percent tranche thus increased the fees the General Partner could claim on interest the Borrower was not paying. The 2025 Financial Statements report that the General Partner's Annual Management/Operational Fee for 2025 alone was $12,272,451, although the Partnership recorded no interest revenue that year, and that $19,823,156 in such fees "remains payable to the general partner" and "has been deferred by the general partner to a later date." The balance sheet records no such liability; the deferred fees are an unbooked claim that the General Partner has reserved to assert against any recovery. Upon information and belief, the 2025 fee also exceeds what Article

VI, Section H permits: the deferred interest the Partnership carried at January 1, 2025 was $17,711,186, and its accrued interest at December 31, 2025 was $25,640,286, an increase of $7,929,100, far less than the $12,272,451 fee claimed for that year. All of this accrues to a General Partner that, as the 2025 Financial Statements note, “was not required to make a capital contribution to the Partnership.”

56. The decision was a conflicted one, not a disinterested exercise of business judgment, and it is entitled to no deference. It was made in the face of an independent appraisal showing that the Hotel was worth less than the senior debt; over the stated preference of the majority of responding limited partners; in favor of a borrower whose principal was simultaneously defaulting on a $450 million CMB-funded project; and on terms that guaranteed fees and priority interest to CMB and Hogan while leaving the limited partners holding the risk.

### G. The Hotel Fails and Defendants Charge the Limited Partners’ Capital Accounts Below Zero

57. The Hotel never stabilized. By April 12, 2023, the General Partner reported that the Hotel’s operations were “insufficient to cover its operating costs and debt service,” that the CMB Lenders had stopped funding shortfalls, that the senior lender was sweeping all operating cash, and that “any economic benefit to the Borrower in the Hotel has been wiped out.” The resulting loss of the Partnership’s capital was not the product of the pandemic alone; it was the foreseeable consequence of the risks Defendants created and concealed: a subordinated position behind a senior lender, a borrower whose principal was defaulting on CMB’s largest loan, and nearly $20 million in new subordinate money committed after an appraisal showed the Hotel to be worth less than the senior debt.

58. USCIS denied Mr. Dehghani’s I-526 petition on May 26, 2023. On June 9, 2023, his immigration counsel informed CMB that he would not appeal. On June 14, 2023, his counsel

asked CMB when it would return his investment. Under Article VIII, Section H(2) of the LPA, upon notice of an individual I-526 denial, the General Partner "shall attempt to obtain a replacement Investor within a period of forty-five (45) days," and upon obtaining one, his $500,000 capital contribution "shall be returned." The condition that a limited partner of the Partnership have received an I-526 approval constituting an "Initial Project Approval" was satisfied: according to the General Partner, by September 2021 eight of the Partnership's 43 limited partners had already completed the EB-5 sustainment period, which presupposes approved I-526 petitions.

59. CMB refused, as it had told Mr. Dehghani in advance that it would. On January 10, 2023, more than four months before USCIS ruled, Ms. Firouzi, by then CMB GmbH's Executive Director, answered Mr. Dehghani's question about the return of his investment in the event of a denial by sending him the LPA's denial provision, which she said "our legal team" had reviewed and provided, together with "the guidance that the General Partner is unable to obtain a replacement client and will not authorize the withdrawal of the Limited Partner at this time as the investment funds are redeployed and not available for repayment of their capital contribution." On June 14, 2023, CMB's Director of Client Relations repeated the identical sentence. On July 25, 2023, CMB's General Counsel wrote that, "[g]iven the stage of the project and the troubled nature of the loan, the General Partner will be unable to obtain a replacement limited partner," and that Group 41 "is not obligated to return capital to a limited partner with a denied I-526." That "troubled" loan was one Defendants chose to make, extend, and enlarge, and it is the reason no replacement investor could be found. CMB never contended that the denial rested on "incomplete, nonresponsive, false, misleading or deceptive information" (Article VIII, Section H(2)(b)), and never stated that it had determined that a replacement limited partner "would be unable to receive

an immigration benefit" (Article VIII, Section H(2)), the grounds on which the LPA excuses the General Partner from seeking a replacement investor; it relied instead on the redeployment and the "troubled nature" of the loan that its own decisions had produced. Nor could the refusal have rested on anything in USCIS's decision: the General Partner announced it in January 2023, more than four months before any decision existed, and CMB, although informed of the denial, was never provided the decision itself by Mr. Dehghani or his counsel. Upon information and belief, the General Partner never attempted to obtain a replacement investor. Neither the Partnership nor CMB GmbH has returned any part of Plaintiff's capital contribution or his $50,000 Syndication Price.

60. On September 30, 2023, the General Partner caused the Partnership to record against Mr. Dehghani's capital account a single "Loss Allowance" entry of $676,026.33 (later adjusted by $30.00), reducing his balance from $497,780.00 to negative $178,246.33. No comparable entry had been recorded at any time in the preceding eight years, during which the largest quarterly loss charged to his account was $7,032.21. The General Partner did not explain the entry until a notice dated February 8, 2024, which stated that the Partnership's auditor had provided an allowance for loan loss equal to "100% of the Partnership's loan principal in the Stanford Court Hotel."

61. The Loss Allowance charged to Mr. Dehghani exceeded his entire $500,000 capital contribution by $176,026.33. Although the February 8, 2024 notice described the allowance as a reserve equal to 100 percent of the Partnership's loan principal, the General Partner has never explained to the limited partners how such a reserve produced a charge to Mr. Dehghani exceeding his entire capital contribution. The 2025 Financial Statements show how. They report a note receivable of $29,067,842, equal to the $21,500,000 the limited partners contributed plus

$7,567,842 funded by the General Partner (the $7,499,576 it advanced in 2021 and the $452,640 it advanced in 2022, less $384,374 the Partnership repaid to it in 2023 out of unused funds the Borrower returned), against which the Partnership has recorded an allowance for credit loss of the full $29,067,842. Divided among the Partnership's 43 limited partners, that allowance is $675,996.33 each, which is precisely the Loss Allowance charged to Mr. Dehghani net of the later $30.00 adjustment. Each limited partner was thus charged with the loss of his own $500,000 and with a further $175,996.33, his one forty-third share of the loss on the money the General Partner advanced, while the 2025 Financial Statements continue to carry the full $7,567,842 as a "Note payable to general partner," repayable before any return of capital to the limited partners. The effect is to charge the limited partners with losses on money the General Partner lent while preserving the General Partner's right to be repaid first, notwithstanding Article IV, Section A(5) of the LPA, which provides that no limited partner shall "be liable for any debts, liabilities, contracts or obligations of the Partnership in excess of the Limited Partner's Capital Contribution." By the General Partner's own account in its December 27, 2021 notice, the Partnership "owes" it interest on the GP Advance at 15 percent. At that rate the GP Advance Obligation now exceeds $12 million, all of it ahead of the limited partners' capital. The 2025 Financial Statements do not record that interest as a liability, an omission that either understates the Partnership's obligations or reflects a waiver the General Partner has never disclosed to the limited partners. Nor can the 2025 Financial Statements be reconciled with the capital account statements the General Partner furnishes to the limited partners. They report an aggregate limited partner deficit of $6,265,108, and a General Partner deficit of $1,497,653, at December 31, 2025. But the General Partner charged all 43 limited partners the same Loss Allowance, and Mr. Dehghani's statement shows his deficit at that date as $180,793.31, so the statements furnished to the limited partners imply an

aggregate limited partner deficit of approximately $7.8 million: about $1.5 million more than the audited figure, and approximately the amount of the deficit the audited books assign to the General Partner. Upon information and belief, the capital account statements furnished to the limited partners charge them with approximately $1.5 million of losses that the Partnership's own books allocate to the General Partner, overstating Mr. Dehghani's deficit by approximately $35,000. The 2025 figures illustrate the pattern: the 2025 Financial Statements allocate the Partnership's $42,721 net loss for 2025 80 percent ($34,177) to the limited partners and 20 percent ($8,544) to the General Partner, consistent with its 20 percent profits interest, yet the expense charges posted to Mr. Dehghani's account for 2025 total $993.50, one forty-third of the entire $42,721.

62. Since the first quarter of 2022, the Partnership has reported no income, but Defendants have continued to charge the limited partners' capital accounts for "Extraordinary Expense[s]" for financial advisory, legal, audit, and insurance costs. Between October 2022 and March 31, 2026, more than $5,500 of such charges were debited to Mr. Dehghani's account, and as of March 31, 2026 his capital account balance was negative $181,042.45. For the first six months of 2026 the Partnership reported no income and $20,120.66 in expenses, including $10,713.00 in "Financial Consulting Fees." The 2025 Financial Statements acknowledge that "the general partner is required to pay all administrative and operating expenses incurred in the ordinary course of business of the Partnership," which the LPA defines as "all normal, recurring" expenses of the Partnership, including "accounting" and "recordkeeping," and "excluding all other extraordinary or one-time expenses." The charges Defendants label "extraordinary" are neither extraordinary nor one-time: Defendants have charged Mr. Dehghani's account for the Partnership's audit in each year from 2017 through 2025 and for "Financial" expenses in every quarter since the first quarter of 2022. The audits the LPA identifies as extraordinary expenses are

"audits by outside agencies" and private audits that a partner requests at his own expense under Article XII, Section A, not the Partnership's own recurring annual audit. The 2025 Financial Statements also show that the $32,127 "consulting expense" recorded for 2025, which corresponds to the "Financial" extraordinary expenses charged to the limited partners that year, was owed to an "affiliate," to which the Partnership owed $163,147 at year end. Defendants have never disclosed what services that affiliate provides, at what rate, or why its charges are not ordinary accounting and recordkeeping expenses that the General Partner must bear. Over the life of his investment Mr. Dehghani has received cash distributions totaling $7,109.83.

### H. Deutsche Bank Moves to Foreclose and Defendants Solicit Additional Capital Without Disclosure

63. The Senior Loan was not repaid at its extended maturity. In January 2025 Deutsche Bank AG, New York Branch sued the Property Owner and Rosenfeld in the Superior Court of California, County of San Francisco, seeking appointment of a receiver for the Hotel and alleging, among other things, that the owner had engaged in waste. *Deutsche Bank AG, New York Branch v. Pine & Powell Partners, LLC*, No. CGC-25-621467. Deutsche Bank also sued in New York County Supreme Court on the payment and shortfall guaranties for the Senior Loan. Index No. 659459/2024. According to the General Partner, a receiver, CHM Warnick, has been appointed for the Hotel.

64. In a notice dated January 9, 2025, the General Partner reported that the Hotel's projected 2024 net operating income was negative $3.96 million; that the revenue per available room needed merely to cover regular interest on the Senior Loan was approximately $244, against a projected 2024 figure of $136; and that the market "would have to improve . . . 79% to cover the ongoing non default senior debt service."

65. On May 18, 2026, Hogan issued a "Confidential Notice to Limited Partners" stating that the balance of the Senior Loan, including principal, accrued interest, and senior protective advances, "is estimated to far exceed $150 million"; that the Hotel "is not expected to reach profitability before debt service"; that the receiver was discussing a sale of the Senior Loan with brokers; and that, "if we do not purchase the senior note, it is almost certain the new senior lender (buyer of the senior note) would commence a foreclosure action, which would result in CMB Lenders' position being completely wiped out." The notice asked limited partners to state by June 17, 2026 whether they would contribute additional capital so the CMB Lenders could purchase the Senior Loan.

66. Limited partners responded with detailed questions, including requests for the Senior Loan balance, the proposed purchase price, the total capital required and its allocation among the five CMB Lenders, how the new capital would be held and controlled, the post-acquisition plan, and any conflicts of interest of the General Partner. In a notice dated July 17, 2026, Hogan extended the response deadline to August 7, 2026, but did not provide that information, instead stating repeatedly that the General Partner would not sign a confidentiality agreement with the receiver or retain counsel to obtain it until limited partners first expressed interest in contributing capital, because doing so would be "an extraordinary expense of the Partnership." In response to a request for "[a]ny conflicts of interest that may exist," the General Partner did not identify any. It did not disclose that any recovery on the CMB Lenders' position would be applied first to its own priority claim for the GP Advance and to the Annual Management/Operational Fees it had deferred (¶¶ 55 and 61). Plaintiff did not respond to either notice and has not agreed to contribute additional capital.

67. Defendants thus continue to solicit additional capital from the limited partners without disclosing the information necessary to evaluate the request, while the General Partner's priority claim on account of the GP Advance continues to accrue at the 15 percent rate it announced and while CMB continues to charge the limited partners' accounts for advisory and other expenses.

**I. Defendants Are Investment Advisers to the Partnership and Its Limited Partners**

68. Each of CMB Colorado, NK, and CMB Export, for compensation, engages in the business of advising others, directly and through the investment partnerships they manage, as to the value of securities and as to the advisability of investing in, purchasing, or selling securities, and each is therefore an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11). The general partners of an investment limited partnership that invests the partnership's assets in securities are investment advisers to the partnership and its limited partners. *Abrahamson v. Fleschner*, 568 F.2d 862 (2d Cir. 1977), *abrogated in part on other grounds by Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979). That is so here, because the Partnership's assets consist of promissory notes and other securities (¶ 69).

69. The Partnership's investments consist of promissory notes and other evidences of indebtedness, including the Redeployment Loan, which is evidenced by secured promissory notes, and the Tranche B participation, each of which is a "security" within the meaning of Section 202(a)(18) of the Advisers Act, 15 U.S.C. § 80b-2(a)(18). The General Partner selects, monitors, restructures, and disposes of those investments, exercising investment discretion on the Partnership's behalf, and is compensated through the Annual Management/Operational Fees, a 20 percent share of the Partnership's net profits and distributable income, and (through its affiliate CMB Export) loan fees. Because substantially all of its assets consist of such investment securities, Group 41 would be an investment company within the meaning of Section 3(a)(1)(C) of the

Investment Company Act of 1940, 15 U.S.C. § 80a-3(a)(1)(C), but for Section 3(c)(1), 15 U.S.C. § 80a-3(c)(1): its securities are beneficially owned by 43 persons, and it has not made and does not propose to make a public offering, having sold its units in a private placement under Rule 506 of Regulation D and Regulation S. Section 3(c)(5)(C) does not apply, because Group 41's sole investment is a mezzanine loan secured by a pledge of membership interests in a limited liability company, not a mortgage or other lien on or interest in real estate. Upon information and belief, Group 41 relies on Section 3(c)(1). Group 41 is therefore a "private fund" within the meaning of Section 202(a)(29) of the Advisers Act, a "pooled investment vehicle" within the meaning of Rule 206(4)-8(b), and a "private investment company" within the meaning of Rule 205-3(d)(3).

70. The LPA, the Subscription Agreement, and the Escrow Agreement, together with the GP Advance, constitute investment advisory contracts between the General Partner (and its affiliates) and the Partnership and its limited partners, including Mr. Dehghani, who is a party to the LPA, the Subscription Agreement, and the Escrow Agreement (collectively, the "Advisory Contracts").

71. Upon information and belief, based on CMB's own statements that it has managed "over 80 EB-5 partnerships" and that, once its then-current partnerships were subscribed, it would have "raised over $2.4 Billion in EB-5 Capital," on the SEC's 2018 order against CMB Export, Hogan, and 37 CMB partnerships (¶ 38), on CMB GmbH's Executive Director's communication of the General Partner's decisions on behalf of "our legal team" (¶ 59), and on the common Rock Island, Illinois and Dallas, Texas addresses from which CMB issues its notices, CMB Colorado, NK, and CMB Export are under common control, share officers, offices, personnel, and compliance functions, and operate as a single integrated advisory business that, at all relevant times, managed well in excess of $150 million in regulatory assets under management across

CMB's dozens of investment partnerships. Upon information and belief, none of CMB Colorado, NK, or CMB Export was registered with the SEC as an investment adviser, and none was entitled to an exemption from registration. Upon information and belief, in a Consent Order of Prohibition to which Hogan and CMB Export stipulated on December 27, 2019 (Illinois Securities Department File No. 1800442), they were ordered to cease and desist from violating the Illinois Securities Law of 1953 and to pay $125,000, based on findings that, between 2011 and 2015, CMB Export used unregistered referrers to sell EB-5 limited partnership interests that were not registered in Illinois, and that the respondents failed to register as dealers, salespersons, investment advisers, or investment adviser representatives.

72. Mr. Dehghani was not, at the time he entered into the Advisory Contracts, a "qualified client" within the meaning of Rule 205-3 under the Advisers Act, 17 C.F.R. § 275.205-3: immediately before he invested, his net worth, together with assets he held jointly with his spouse and excluding the value of any primary residence, did not exceed $2,000,000; he did not have $1,000,000 or more under the management of the General Partner; and he was not a "qualified purchaser." Because Group 41 is a private investment company (¶ 69), each of its equity owners, including Mr. Dehghani, is treated as a client for this purpose. 17 C.F.R. § 275.205-3(b). The General Partner's 20 percent share of the Partnership's "net profits and distributable income" is compensation "on the basis of a share of capital gains upon or capital appreciation of the funds or any portion of the funds of the client" within the meaning of Section 205(a)(1) of the Advisers Act, 15 U.S.C. § 80b-5(a)(1).

73. The GP Advance was a transaction in which the General Partner, acting as principal for its own account, purchased from its client, the Partnership, a security, namely the Partnership's 15 percent, priority obligation to repay the GP Advance. The General Partner did not disclose to

the Partnership or its limited partners in writing, before completion of the transaction, the capacity in which it was acting, and did not obtain the consent of the client to the transaction, within the meaning of Section 206(3) of the Advisers Act, 15 U.S.C. § 80b-6(3). The General Partner, which controlled the Partnership, could not supply that consent on the Partnership's behalf; the limited partners were told "[t]his is not a vote"; and the General Partner's decision to make the GP Advance was first disclosed only after it was made. No limited partner, independent committee, or other person unaffiliated with the General Partner consented to the GP Advance on the Partnership's behalf.

74. In performing the Advisory Contracts, the General Partner and CMB Export employed devices, schemes, and artifices to defraud, and engaged in transactions, practices, and courses of business that operated as a fraud and deceit upon their clients and upon investors in a pooled investment vehicle, in violation of Sections 206(1), 206(2), and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), (4), and Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8, including by the conduct alleged in Parts D through H of the Substantive Allegations. Each of these violations renders the Advisory Contracts void under Section 215 of the Advisers Act (Count VI).

## VI. TIMELINESS

75. *Federal securities claims.* A statute of repose runs from "the date of the last culpable act or omission of the defendant." *California Public Employees' Retirement System v. ANZ Securities, Inc.*, 582 U.S. 497, 505 (2017) (quoting *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014)). The scheme alleged in Count I was a single course of conduct that began with the 2015 offering and continued through the 2021 Fourth Amendment, the 2023 refusal to return Plaintiff's capital, the 2023–2026 capital account entries, and the 2026 solicitations; Defendants' last culpable acts fall well within five years of this action. Independently, each of Counts I through III

rests on culpable acts within five years of this action: the Fourth Amendment and the GP Advance, through which the Partnership exchanged and acquired securities, closed on November 23, 2021; the December 27, 2021 notice made the "offset" misrepresentation; and the refusals, account charges, notices, and solicitations of 2023 through 2026 followed. The omissions on which Count II rests were not complete when the September 14, 2021 notice issued. Defendants remained under a duty to disclose the omitted facts, and continued to withhold them, until the Fourth Amendment closed on November 23, 2021, and a violation of Section 10(b), which requires a purchase or sale, was not complete until that transaction occurred. Plaintiff did not discover the facts constituting the violations, including Defendants' scienter, until June 2026, when he first learned of CMB's Century Plaza exposure and default (¶ 77(a)), and this action is filed within two years of that discovery. 28 U.S.C. § 1658(b); *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010). Section 29(b)'s one-year/three-year proviso applies only to Section 15(c)(1) and (2) violations; no federal statute expressly prescribes a limitations period for rescission premised on Section 15(a) violations, and the most analogous borrowed periods, New York's six-year period for rescission (CPLR 213(1)) and, for claims sounding in fraud, the greater of six years from the fraud or two years from its discovery (CPLR 213(8)), are satisfied.

76. *Advisers Act and RICO claims.* The Advisory Contracts are still being performed in violation of the Advisers Act, including through fee and expense charges, the General Partner's accrual of deferred Annual Management/Operational Fees, and the interest accruing on the GP Advance, and each act of performance is a further violation. Plaintiff discovered his RICO injuries – including the September 30, 2023 Loss Allowance, first explained on February 8, 2024, and the subsequent expense charges – within four years of this action, and each is a separately accruing injury; older racketeering acts are properly part of the pattern.

77. *State-law claims.* The state-law claims are timely for each of the following independent reasons:

a. *Discovery.* The fraud-based claims are timely under CPLR 213(8), which allows the greater of six years from the fraud or two years from when Plaintiff discovered, or reasonably could have discovered, it. The claims arising from the Fourth Amendment, the GP Advance, and later conduct were commenced within six years of that conduct, and all of the fraud-based claims were commenced within two years of discovery. Plaintiff invested from abroad through Persian-language materials, with no U.S. brokerage account or private-placement experience. Upon information and belief, the General Partner never told the limited partners of the SEC's 2018 findings, the referrer compensation, the redeployment before it occurred, or the Century Plaza default. Plaintiff first learned in June 2026 that CMB's affiliate Group 48 was the mezzanine lender on Rosenfeld's Century Plaza project and that the project had defaulted in July 2021, facts that the General Partner never disclosed to the limited partners, and first learned from the 2025 Financial Statements, whose auditor's report is dated October 14, 2026, that the Loss Allowance charged him with losses on the General Partner's own advance. Plaintiff did not learn of the SEC's September 21, 2018 order (¶ 38) until 2026.

b. *Equitable estoppel.* The General Partner and Hogan were fiduciaries with a duty of full disclosure, and a fiduciary's silence is itself concealment that tolls limitations. Defendants also affirmatively represented that their

decisions were in the Partnership's best interest and that the GP Advance interest would be "offset," told Plaintiff in January 2023 that the General Partner would "likely reconsider" his withdrawal "[u]pon the repayment of the redeployed funds to the Partnership," and as recently as July 2026 refused limited partners' requests for information and disclosure of conflicts.

c. *Delaware tolling.* To the extent Delaware law applies, limitations were tolled under the doctrines of inherently unknowable injury, fraudulent concealment, and equitable tolling for self-dealing fiduciaries.

d. *Open repudiation.* The equitable claims against fiduciaries did not accrue until the General Partner openly repudiated its obligations to Plaintiff on June 14 and July 25, 2023, and are subject to a six-year period.

e. *Continuing wrongs.* Each quarter in which the General Partner maintained the unauthorized investment, accrued fees and priority interest for itself, issued a misleading statement, or debited Plaintiff's account was a new breach.

78. *Governing law.* The LPA provides that it is governed by Delaware law, and Delaware law governs the Partnership's internal affairs, including the fiduciary duties of the General Partner and those who control it. The Subscription Agreement and the Escrow Agreement are governed by New York law. Plaintiff's fraud and other tort claims are governed by New York law or, alternatively, by the law of the jurisdiction with the greatest interest in the issue, and they are adequately pleaded under any potentially applicable law.

## VII. DERIVATIVE ALLEGATIONS

79. Plaintiff brings Count III derivatively, and Counts IV, VI, IX, XII, XIII, and XVI both individually and derivatively, in the right and for the benefit of Group 41, pursuant to Federal Rule of Civil Procedure 23.1 and 6 Del. C. § 17-1001. All other Counts are brought individually. To the extent any claim pleaded individually belongs to the Partnership, or vice versa, Plaintiff pleads it in the alternative both ways.

80. Plaintiff was a limited partner of Group 41 at the time of each transaction complained of, including the June 12, 2019 redeployment, the November 23, 2021 Fourth Amendment, and the GP Advance, and has continuously held his partnership interest since December 9, 2015. Plaintiff will fairly and adequately represent the interests of the Partnership and its limited partners in enforcing the Partnership's rights. This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

81. Plaintiff has not made a demand on the General Partner to bring these claims because such a demand would be futile and is excused. Under the LPA, the General Partner has exclusive authority to manage the Partnership and to cause it to sue. Since December 30, 2019, the General Partner has consisted solely of CMB Colorado, which, like its former co-general partner NK, is managed and controlled by Hogan. The General Partner, Hogan, and CMB Export are the wrongdoers and are the principal beneficiaries of the challenged transactions: the General Partner is the lender of the GP Advance and the holder of the 15 percent priority claim that Plaintiff seeks to void; CMB Export received the origination, facility, document preparation, and administration fees that Plaintiff seeks to recover; and Hogan signed every challenged agreement on every side. Each faces a substantial likelihood of personal liability on the claims asserted. None could impartially consider a demand to sue itself or its affiliates, and the effort to cause the General

Partner to bring this action is not likely to succeed. 6 Del. C. §§ 17-1001, 17-1003. Indeed, when Plaintiff's counsel requested the return of his capital in 2023, the General Partner refused, and when limited partners requested basic information and a disclosure of conflicts in 2026, the General Partner refused to provide it.

## VIII. CLAIMS FOR RELIEF

### A. Federal Claims

**COUNT I**
***Section 10(b) and Rule 10b-5(a) and (c): Scheme Liability***
**(Individually, Against CMB Colorado, NK, CMB Export, CMB GmbH, Hogan, Group 41, and John Does 1–10)**

82. Plaintiff repeats and realleges paragraphs 1 through 81 above.

83. Plaintiff's limited partnership interest is a "security," as alleged above, and he purchased it in a domestic transaction: the General Partner accepted his subscription in Rock Island, Illinois, and his payment was wired to and held at a U.S. bank.

84. From 2015 through 2026, Defendants knowingly or recklessly employed a scheme to defraud Plaintiff in connection with that purchase, by the conduct alleged in Parts B through H of the Substantive Allegations: soliciting his investment through undisclosed, compensated, unregistered intermediaries in an offering lacking a valid exemption, and through Ms. Firouzi's oral assurance and Persian- and English-language materials representing that his capital would be returned if his I-526 petition were denied, while representing in the PPM that the units were likely not securities and that the SEC inquiry was dormant; then deploying his capital to generate fees for CMB and to serve CMB's relationship with Rosenfeld; and then lulling him with misleading notices and capital account statements, refusing to return his capital, and soliciting more, to prevent him from discovering the fraud in the sale and seeking rescission. Defendants' last culpable acts in furtherance of the scheme occurred within five years of this action. Defendants' scienter rests

not on generalized motive but on their own conduct: CMB Export and Hogan themselves made the transaction-based payments to unregistered referrers that the PPM concealed, and Hogan executed the offering documents that described the SEC inquiry as dormant while that conduct continued. Each Defendant participated in the scheme as follows: Group 41, acting through the General Partner, issued the PPM and sold Plaintiff his unit; CMB Colorado and NK, as the General Partner, issued the PPM, accepted Plaintiff's subscription, and caused the 2019 redeployment, and CMB Colorado thereafter caused the Fourth Amendment and the GP Advance and issued the notices and capital account statements described in Parts E through H; CMB Export, with its affiliated CMB regional centers, published the Persian-language brochure presented to Plaintiff, paid the undisclosed referrer compensation, acted as Agent on the Redeployment Loan, and received the origination fee described in paragraph 52 and, upon information and belief, the fees described in paragraph 42; CMB GmbH, upon information and belief, solicited Plaintiff's investment through Ms. Firouzi, and it received his $50,000 Syndication Price and, upon information and belief, used it to support its "foreign finder network," including through "referral agreements," the purpose for which the PPM reserved it, without disclosing who would be paid, how much, or on what basis; and Hogan, who managed CMB Colorado, NK, and CMB Export and, upon information and belief, controlled CMB GmbH, directed this conduct and signed the operative documents. Hogan's knowledge is imputed to each entity Defendant that acted through him.

85. Plaintiff relied on Defendants' disclosures and the integrity of the offering; because the claim rests primarily on omissions by persons with a duty to disclose, reliance is presumed. Alternatively, Plaintiff actually relied on Ms. Firouzi's presentation, including her November 14, 2015 assurance that his principal would be returned if his I-526 petition were denied, and on

CMB's Persian-language brochure, the primary bases for his decision to invest (¶ 30), which, like the PPM, omitted the facts described in ¶¶ 35 and 36. The concealed facts were a substantial cause of Plaintiff's loss: the concealed illegality of the offering exposed the Partnership to the SEC's penalty and deprived Plaintiff of a timely rescission remedy, and the later stages of the scheme (the redeployment, the Fourth Amendment, and the GP Advance) caused the loss of his capital. As a direct and proximate result, Plaintiff lost his $550,000 investment and is entitled to rescission or rescissory damages, or alternatively out-of-pocket damages.

**COUNT II**
***Section 10(b) and Rule 10b-5: Fundamental Change***
**(Individually, Against CMB Colorado, CMB Export, Hogan, and John Does 1–10)**

86. Plaintiff repeats and realleges paragraphs 1 through 81 above.

87. The Fourth Amendment and GP Advance so fundamentally changed Plaintiff's investment that, on or about November 23, 2021, he was deemed to purchase, or to exchange his original interest for, a new security: a residual interest subordinated to the General Partner's 15 percent priority claim, in a partnership whose principal asset was a non-paying, deeply subordinated participation in a defaulted loan to a developer then in default on CMB's Century Plaza investment.

88. In connection with that purchase or exchange, CMB Colorado and Hogan knowingly or recklessly made the misstatements and omissions, and each Defendant named in this Count employed the scheme, alleged in Parts E and F of the Substantive Allegations. Specifically, in the September 14, 2021 notice, which CMB Colorado sent to the limited partners as General Partner under Hogan's management, CMB Colorado and Hogan presented the choice between a sale and further lending (¶¶ 46 and 47) while omitting the facts described in paragraph 48 and the senior debt constraint described in paragraph 51, and no Defendant disclosed those facts before the Fourth Amendment closed (¶ 49). CMB Export participated in the scheme by executing the

Fourth Amendment as Agent, through Hogan, on terms that conditioned the new lending on the Borrower's payment to CMB Export, for its own account, of the origination fee described in ¶ 52. Hogan knew the omitted facts (¶¶ 48(b), 50, and 52), and his knowledge is imputed to CMB Colorado and CMB Export, which acted through him. Reliance is presumed as to Defendants' omissions. As a direct and proximate result, Plaintiff was damaged, including by the loss of the approximately $300,000 per limited partner that a 2021 sale was projected to return.

**COUNT III**
***Section 10(b) and Rule 10b-5***
**(Derivatively on Behalf of Group 41, Against CMB Colorado, CMB Export, Hogan, and John Does 1–10)**

89. Plaintiff repeats and realleges paragraphs 1 through 81 above.

90. On or about November 23, 2021, Defendants caused Group 41 (a) to purchase a $7,499,576.08 participation in the Tranche B note, and (b) to issue to the General Partner, for the GP Advance, an obligation to repay that amount with 15 percent interest ahead of any distribution or return of capital to the limited partners (the "GP Advance Obligation"). Each is a "note" and "evidence of indebtedness," and thus a "security," under 15 U.S.C. § 78c(a)(10): each was acquired for investment at a 15 percent return, was distributed among multiple investors (Tranche B among five partnerships with 269 investors; the identical obligation was offered to all of them as "Partner Loans"), would reasonably be viewed as an investment, and is subject to no alternative regulatory scheme.

91. CMB Colorado and Hogan, who controlled the Partnership, together with CMB Export, which executed the Fourth Amendment as Agent and received the origination fee, caused these transactions on terms unfair to it and favorable to themselves, while knowingly or recklessly concealing from the limited partners the facts alleged in Parts E and F of the Substantive Allegations. Had those facts been disclosed, the limited partners could and would have prevented

the transactions, by calling a meeting, withholding the consent required to alter the Partnership's purpose, or seeking injunctive relief under Delaware law. *Goldberg v. Meridor*, 567 F.2d 209 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069 (1978); *Frankel v. Slotkin*, 984 F.2d 1328 (2d Cir. 1993); *see Schoenbaum v. Firstbrook*, 405 F.2d 215 (2d Cir. 1968) (en banc), *as construed in Goldberg*, 567 F.2d at 217-18. Defendants' scienter is established by Hogan's execution of the Fourth Amendment on every side, CMB's first-hand knowledge of the Century Plaza default, the JLL and Eastdil valuations, and Defendants' fee and priority-interest motives.

92. As a direct and proximate result, Group 41 lost its $7,499,576.08 Tranche B investment, incurred a GP Advance Obligation that, with interest at the 15 percent rate the General Partner announced, now exceeds $12 million, and lost approximately $12.9 million it could have recovered in a 2021 sale. Group 41 is entitled to damages, cancellation of the GP Advance Obligation, and disgorgement of Defendants' fees and interest.

## <u>COUNT IV</u>
### *Section 20(a) of the Exchange Act*
### (Individually and Derivatively, Against Hogan and CMB Export)

93. Plaintiff repeats and realleges paragraphs 1 through 81 above.

94. CMB Colorado (Counts I through III) and NK, Group 41, and CMB GmbH (Count I) committed the primary violations alleged in those Counts. Hogan, as Manager of CMB Colorado, NK, and CMB Export and the signatory of every challenged document, and CMB Export, as the administrator and Agent with which the primary violators share management, personnel, and offices, controlled the primary violators and culpably participated in the violations. They are jointly and severally liable under 15 U.S.C. § 78t(a).

## <u>COUNT V</u>
### *Rescission Under Section 29(b) of the Exchange Act*
### (Individually, Against Group 41, CMB Colorado, NK, CMB Export, and CMB GmbH)

95. Plaintiff repeats and realleges paragraphs 1 through 81 above.

96. Under 15 U.S.C. § 78cc(b), contracts made in violation of the Exchange Act, or whose performance involves such a violation, are void as to the rights of the violator. The SEC found that CMB Export and Hogan caused violations of Section 15(a)(1) by paying unregistered U.S.-based referrers transaction-based compensation for soliciting investors in CMB offerings, including Group 41's. The Subscription Agreement and Escrow Agreement themselves required that $50,000 of Plaintiff's payment go to CMB GmbH to "support CMB GmbH's foreign finder network" and its "referral agreements"; their performance therefore required and involved prohibited transaction-based compensation. Upon information and belief, persons who solicited Plaintiff were so compensated. The Syndication Price was itself transaction-based compensation: the PPM provided that CMB GmbH "will be paid a $50,000 Syndication Price per Unit" sold "for serving as a foreign sourcing entity for prospective Investors in this offering," and the Subscription and Escrow Agreements required that payment to CMB GmbH out of each investor's escrowed funds. Upon information and belief, CMB GmbH was not registered as a broker or dealer, and it used the means of interstate commerce in soliciting and effecting those sales, including Plaintiff's, in which a Delaware issuer's units were sold through subscription documents accepted in the United States and paid for by wire to a United States bank. The agreements thus could not be performed according to their terms without paying an unregistered person transaction-based compensation for effecting securities transactions, and they are unlawful contracts subject to rescission. *Xeriant, Inc. v. Auctus Fund LLC*, 141 F.4th 405 (2d Cir. 2025).

97. The agreements are void as to Defendants' rights, and Plaintiff is entitled to rescission and restitution of $550,000, less distributions received, with interest.

## COUNT VI
### *Rescission and Restitution Under Section 215 of the Advisers Act*
### (Individually and Derivatively, Against CMB Colorado, NK, CMB Export, and Group 41)

98. Plaintiff repeats and realleges paragraphs 1 through 81 above.

99. Section 215(b), 15 U.S.C. § 80b-15(b), voids every contract made in violation of the Advisers Act, or whose performance involves such a violation or "the continuance of any relationship or practice in violation of" it, as regards the rights of the violator, and affords parties a private right of action for rescission and restitution. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979).

100. Plaintiff and Group 41 are parties to the Advisory Contracts, and Group 41 is a party to the GP Advance and the Redeployment Loan documents. CMB Colorado, NK, and CMB Export made and performed those contracts in violation of Sections 206(1), (2), and (4) and Rule 206(4)-8 (fraud on clients and pooled-vehicle investors); Section 206(3) (the GP Advance, a principal transaction without prior written disclosure and client consent); Section 205(a)(1) (the 20 percent profit share charged to a non-qualified client); and Section 203(a) (unregistered advisory business), as alleged in Part I of the Substantive Allegations. That performance continues today.

101. Plaintiff is entitled to rescission and to restitution of the consideration he gave under the Advisory Contracts, less any value conferred, *see Transamerica*, 444 U.S. 11: his $500,000 capital contribution, which was the consideration for his interest under the LPA, and his $50,000 Syndication Price, less $7,109.83 in distributions, with interest; and, in any event, all fees, profit share, and expense charges taken from his capital under the Advisory Contracts. Group 41 is entitled to rescission of the GP Advance (or, alternatively, subordination of any claim on it to the return of the limited partners' capital) and restitution of all Annual Management/Operational Fees, profit share, and CMB Export's document preparation, facility, administration, extension, and origination fees, with interest.

**COUNT VII**

***RICO, 18 U.S.C. § 1962(c)***

**(Individually, Against Hogan, CMB Colorado, NK, CMB Export, CMB GmbH, and John Does 1–10)**

102. Plaintiff repeats and realleges paragraphs 1 through 81 above. This Count is pleaded in the alternative to Counts I through IV, to the extent the conduct alleged is not actionable as fraud in the purchase or sale of securities. In particular, the predicate acts described in clauses (f) and (g) of paragraph 104, the June and July 2023 refusals to return Plaintiff's capital and the quarterly capital account statements charging him with the Loss Allowance and the expense debits, concern the General Partner's administration of an interest Plaintiff already held, its retention of his capital, and charges against his account. They were not made in connection with any purchase or sale of a security by Plaintiff or anyone else, would not be actionable as securities fraud by any person, and independently constitute a pattern of racketeering activity.

103. The CMB investment partnerships sponsored by Hogan, including Group 41, Group 48, and the other CMB Lenders, together with their general partners, CMB Export as administrator and Agent, and CMB GmbH as foreign sourcing entity, form an association-in-fact enterprise that has existed since at least 2011 for the common purpose of raising, lending, and administering foreign EB-5 capital (the "CMB Enterprise"). Alternatively, the CMB Lenders, their general partners, and CMB Export as Agent form an association-in-fact enterprise (the "CMB Lender Enterprise"). Each enterprise is distinct from each Defendant and engaged in interstate and foreign commerce.

104. Each Defendant conducted or participated in the conduct of the enterprise's affairs through a pattern of mail and wire fraud, 18 U.S.C. §§ 1341, 1343, in a scheme to obtain investors' capital and Syndication Prices and thereafter fees, profit share, priority interest, expense reimbursements, and additional capital by false pretenses and concealment. The predicate acts

include: (a) the 2015 transmission of the PPM, agreements, and marketing materials to Plaintiff abroad, including Ms. Firouzi's November 14, 2015 email attaching CMB's brochures, and his $550,000 international wire; (b) the 2011–2015 payments to unregistered referrers, including to foreign accounts; (c) the June 12, 2019 Redeployment Loan documents, $21,500,000 wire, and fee payments to CMB Export; (d) the September 14 and December 27, 2021 notices; (e) the November 23, 2021 Fourth Amendment and origination-fee wire; (f) the January 10, June 14, and July 25, 2023 emails refusing to return Plaintiff's capital; (g) the capital account statements reflecting the Loss Allowance and expense charges; (h) the 2023–2026 notices identified in Parts G and H of the Substantive Allegations; and (i) the May 18 and July 17, 2026 solicitations. These acts were related and continuous, spanning more than a decade and threatening to continue. The predicate acts are attributable to each Defendant as follows: Hogan directed each of them and personally signed or issued the documents and notices in acts (a), (c), (e), (h), and (i) and the December 27, 2021 notice in act (d); CMB Colorado and NK committed acts (a) and (c), and CMB Colorado also committed acts (d) through (i); CMB Export committed acts (b), (c), and (e), including its receipt of the fees described in paragraphs 42 and 52; and CMB GmbH committed act (a) by receiving the $50,000 Syndication Price released from Plaintiff's wired funds, upon information and belief by international wire, and, upon information and belief, act (b) by funding referral compensation through its "foreign finder network," and, through Ms. Firouzi, the November 14, 2015 email in act (a) and the January 10, 2023 email in act (f). Each communication identified above was transmitted by interstate or international wire or by mail, including by email and through the ShareFile portal, and was false or misleading, or furthered the scheme, for the reasons alleged in the paragraphs of the Substantive Allegations that describe it.

105. Plaintiff was injured in his business or property by reason of the violation, through the loss of his investment, the subordination of his capital to the GP Advance, and the Loss Allowance and expense charges. His injury is domestic: his property is an interest in a Delaware partnership managed from Illinois and Texas, holding a loan secured by a California hotel, and the racketeering was directed from the United States. *See Yegiazaryan v. Smagin*, 599 U.S. 533 (2023). He is entitled to treble damages, costs, and attorney's fees under 18 U.S.C. § 1964(c).

**COUNT VIII**
***RICO Conspiracy, 18 U.S.C. § 1962(d)***
**(Individually, Against All Defendants Other Than Group 41)**

106. Plaintiff repeats and realleges paragraphs 1 through 81 above. Each Defendant knowingly agreed to conduct or participate in the affairs of the CMB Enterprise and the CMB Lender Enterprise through the pattern alleged in Count VII, knowing the scheme's general nature and agreeing that it or a co-conspirator would commit at least two predicate acts. Plaintiff was injured thereby and is entitled to treble damages, costs, and attorney's fees.

**COUNT IX**
***Declaratory Judgment, 28 U.S.C. §§ 2201–2202***
**(Individually and Derivatively, Against All Defendants)**

107. Plaintiff repeats and realleges paragraphs 1 through 81 above. An actual controversy exists, and Plaintiff is entitled to a declaration that: (a) the GP Advance and GP Advance Obligation are void as to the General Partner or, alternatively, subordinate to the return of the limited partners' capital; (b) Defendants may not charge Plaintiff's or the Partnership's capital for fees, profit share, or expenses under contracts void under Section 29(b) or Section 215; (c) Defendants are not entitled to indemnification or advancement from Partnership assets for the conduct alleged herein; (d) the claims asserted herein are not subject to arbitration; and (e) Plaintiff is not obligated to contribute additional capital, and Defendants may not subordinate or forfeit his

interest, or dilute it other than on the terms Article IV, Section A(6) of the LPA permits, for declining to do so.

### B. State-Law Claims (Supplemental Jurisdiction, 28 U.S.C. § 1367)

**COUNT X**
***Fraud, Fraudulent Inducement, and Fraudulent Concealment***
**(Individually, Against CMB Colorado, NK, CMB Export, CMB GmbH, Hogan, Group 41, and John Does 1–10)**

108. Plaintiff repeats and realleges paragraphs 1 through 81 above.

109. Defendants made, or participated in, the material misrepresentations and omissions alleged in Parts B, D, E, F, and G of the Substantive Allegations, including: (a) the statement in the PPM dated July 27, 2015, which Group 41 and the General Partner issued under Hogan's management and which was delivered to Plaintiff in connection with his November 20, 2015 subscription, that the units were "likely" not securities (¶¶ 34 and 35); (b) the PPM's statement that CMB had not had "any additional contact from the SEC," made while CMB Export and Hogan were paying the unregistered referrers whose compensation the SEC later sanctioned (¶¶ 34, 35, and 38); (c) the PPM's omission of the compensation paid to those who solicited Plaintiff (¶ 36); (d) the PPM's omission that the offering lacked a valid exemption from registration (¶¶ 35 and 38); (e) the General Partner's concealment from the limited partners, in its notices, of the redeployment until after it occurred (¶¶ 40 and 43), of the extent of CMB's Rosenfeld relationship and the Century Plaza default (¶¶ 43, 48(a), and 50), of the JLL and Eastdil valuations (¶¶ 48(b) and 49), of CMB Export's fees (¶¶ 43, 48(c), and 49), and of the effect of the GP Advance on the limited partners' capital (¶¶ 48(d), 48(e), and 61); (f) the representation in the December 27, 2021 notice, which Hogan signed as "Manager of the General Partner," that Borrower interest would "offset" the GP Advance interest (¶ 53); (g) upon information and belief, the concealment of the SEC's 2018 findings and penalty against Group 41, which none of the General Partner's notices

in Plaintiff's possession mentions (¶¶ 38 and 77(a)); and (h) the statement in CMB's February 2015 Persian-language brochure, which Ms. Firouzi presented to Plaintiff at his office in Tehran on November 14, 2015 and emailed to him the same day, that an investor's capital "will be returned" if the I-526 petition is denied; the corresponding statement on page 20 of CMB's English-language brochure, presented and emailed with it, that the investor's capital and syndication fee would be refunded; and Ms. Firouzi's oral assurance at that meeting, in response to Plaintiff's specific question, that his principal would be returned if his I-526 petition were denied (¶¶ 30 and 35). The statements and omissions in clauses (a) through (d) were made by Group 41, CMB Colorado, NK, and Hogan, as the issuer, the General Partner, and their Manager; those in clauses (e) through (g) were made by CMB Colorado and Hogan and, for the period through December 30, 2019, NK. The statements in clause (h) were made by CMB Export, which published the brochures with its affiliated CMB regional centers and on whose behalf, upon information and belief, Ms. Firouzi acted; by Hogan, CMB's President and Chief Executive Officer; and, upon information and belief, by CMB GmbH, through Ms. Firouzi. CMB Export, which had exclusive knowledge of the referrer payments and of its own fees, and CMB GmbH participated in the fraud as alleged in paragraph 84.

110. Defendants knew these statements were false or misleading, or made them recklessly, and intended that Plaintiff rely on them in investing, remaining invested, and refraining from asserting his rights. Hogan knew the facts that made them false or misleading: he and CMB Export made the referrer payments (¶ 38); Group 48, the Century Plaza lender, is a partnership he controls (¶¶ 26 and 50); the General Partner he managed received the JLL and Eastdil valuations (¶ 48(b)); and he signed the Fourth Amendment for every party on the lender side (¶ 52). His knowledge is imputed to each entity Defendant that acted through him. Defendants had a duty to

disclose by reason of their partial statements, their exclusive knowledge, and, after his admission, their fiduciary relationship with him. Plaintiff (a first-time private-placement investor relying on Persian-language materials) justifiably relied on them. The general acknowledgments in the Subscription Agreement and LPA do not bar these claims: the misrepresented and omitted facts were peculiarly within Defendants' knowledge, and any purported waiver of compliance with the Exchange Act or the Advisers Act is void. 15 U.S.C. §§ 78cc(a), 80b-15(a).

111. As a direct and proximate result, Plaintiff lost his $550,000 investment. He elects rescission of the Subscription Agreement, the LPA, and the Escrow Agreement, tenders his partnership interest, and seeks restitution of $550,000 less distributions, with interest; alternatively, damages, including the fees he paid to immigration counsel and investment advisers in connection with the investment. Because Defendants' fraud was willful and directed at a class of vulnerable foreign investors, Plaintiff is entitled to punitive damages.

**COUNT XI**
***Negligent Misrepresentation***
**(Individually, in the Alternative, Against CMB Colorado, NK, CMB Export, Hogan, and Group 41)**

112. Plaintiff repeats and realleges paragraphs 1 through 81 above. In the alternative to Count X, Defendants – holding themselves out as possessing unique EB-5 expertise, and thereafter as Plaintiff's fiduciaries – had a special relationship with Plaintiff imposing a duty to impart correct information, negligently made the misrepresentations and omissions alleged in paragraph 109 knowing he would rely on them, and damaged him thereby.

**COUNT XII**
***Breach of Fiduciary Duty***
**(Individually and Derivatively, Against CMB Colorado, NK, and Hogan)**

113. Plaintiff repeats and realleges paragraphs 1 through 81 above.

114. CMB Colorado, as a general partner at all relevant times, and NK, as a general partner through December 30, 2019, owed, and CMB Colorado continues to owe, Plaintiff and Group 41 duties of loyalty, care, good faith, and candor; as the person controlling the General Partner and the Partnership's assets, Hogan owes the same duties. *In re USACafes, L.P. Litigation*, 600 A.2d 43 (Del. Ch. 1991). Plaintiff's claims are direct to the extent they arise from injuries distinct from those of the Partnership, including the misstatements and omissions directed to him in connection with his own subscription, the refusal to process his withdrawal under Article VIII, Section H(2), and the charges to his individual capital account, each of which violated rights the LPA confers on him individually, and derivative to the extent they arise from injury to the Partnership. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).

115. They breached those duties by: (a) the 2019 redeployment, which the General Partner undertook for CMB's benefit, without prior disclosure to or approval by the limited partners, and outside the Partnership's stated purpose; (b) the Fourth Amendment and GP Advance, over the responding limited partners' stated preference and against the JLL and Eastdil valuations; (c) taking a 15 percent priority claim against the Partnership they managed; (d) permitting CMB Export's fees on loans funded with limited-partner capital; (e) the nondisclosures alleged in Count X; (f) deciding, before Plaintiff's petition was even denied, that it would not seek a replacement investor or return his capital, refusing in bad faith to do either, and then charging him a Loss Allowance exceeding his contribution; (g) charging expenses to the limited partners while the Partnership earns nothing; (h) soliciting capital in 2026 while withholding the information needed to evaluate it; and (i) charging the limited partners with the loss on the funds the General Partner advanced, and accruing nearly $20 million in deferred fees on interest the Borrower was not paying, while preserving the General Partner's priority claims to both. The LPA

does not eliminate the General Partner's fiduciary duties, and its exculpation provision expressly excepts material violations of the LPA causing a Material Adverse Effect to the Partnership, gross negligence, and willful misconduct, each of which is alleged here. Nor may the LPA limit liability for a bad-faith violation of the implied covenant of good faith and fair dealing. 6 Del. C. § 17-1101(f).

116. Plaintiff and Group 41 have been damaged as a direct and proximate result, and are entitled to damages (including, as to Plaintiff, the fees he paid to immigration counsel and investment advisers in connection with the investment), rescissory damages, disgorgement, rescission of the GP Advance, and, to the extent permitted by applicable law, punitive damages.

**COUNT XIII**

***Aiding and Abetting Fraud and Breach of Fiduciary Duty***

**(Individually and Derivatively, Against CMB Export, CMB GmbH, Hogan, and John Does 1–10)**

117. Plaintiff repeats and realleges paragraphs 1 through 81 above. CMB Export, CMB GmbH, Hogan, and John Does 1–10 had actual knowledge of the fraud and fiduciary breaches alleged in Counts X and XII because Hogan directed them, and CMB Export and CMB GmbH share his management and acted at his direction. Each also substantially assisted them: CMB Export by supplying the officers presented in the "Management" section of the PPM (¶ 19), paying the referrers, acting as Agent, and taking fees; CMB GmbH by receiving the Syndication Price and funding the finder network; and Hogan by executing every challenged agreement and notice. Plaintiff and Group 41 were damaged as a direct and proximate result and are entitled to damages, disgorgement, and punitive damages.

**COUNT XIV**
***Breach of Contract and of the Implied Covenant of Good Faith and Fair Dealing***
**(Individually, Against Group 41, CMB Colorado, and NK)**

118. Plaintiff repeats and realleges paragraphs 1 through 81 above. Plaintiff fully performed the LPA, Subscription Agreement, and Escrow Agreement. Defendants breached them by: (a) altering the Partnership's primary purpose and business in 2019 and 2021 without the consent of the Required Majority or, alternatively, reinvesting the Partnership's capital in a manner not "consistent with the business and purpose of the Partnership"; (b) failing to "use commercially reasonable efforts to advance and accomplish the Partnership's business and purpose"; (c) failing to "attempt to obtain a replacement Investor within a period of forty-five (45) days" after notice of Plaintiff's I-526 denial, as Article VIII, Section H(2) requires, having announced before the denial that it would not do so; (d) incurring the GP Advance Obligation, financing from the General Partner itself at 15 percent, although Article IV, Section A(6) permits the General Partner to meet a need for additional capital only through optional limited-partner contributions, financing "from a third party . . . on commercially reasonable terms," or the admission of additional partners, and subordinating the limited partners' capital to that obligation without authority; (e) allocating to Plaintiff a Loss Allowance exceeding his contribution, contrary to Article IV, Section A(5), and charging expenses not chargeable under the LPA, including the Partnership's recurring annual audit and quarterly "Financial" charges, which are Partnership Administrative and Operating Expenses that Article VI, Section I and Article IX, Section C require the General Partner to pay "from its own general revenues," and claiming Annual Management/Operational Fees in excess of those Article VI, Section H permits; and (f) failing to provide required reports and information. Defendants also breached the implied covenant by exercising their discretion over redeployment, replacement investors, loss allocation, and expenses arbitrarily and in bad faith, including invoking their "sole discretion" to deny withdrawal after their own decisions made a replacement investor

impossible. Each quarterly continuation and each charge is a separate breach. Plaintiff is entitled to damages and specific performance.

**COUNT XV**
***Conversion***
**(Individually, Against CMB Colorado, NK, CMB Export, CMB GmbH, and Hogan)**

119. Plaintiff repeats and realleges paragraphs 1 through 81 above. Plaintiff had a possessory right in specifically identifiable funds: the $550,000 he wired, for further credit to his name, into an escrow or segregated bank account that the PPM represented was “owned by each individual Investor” and “held on behalf of the Investor,” and thereafter the funds credited to his capital account. Defendants exercised unauthorized dominion over those funds by releasing $50,000 to CMB GmbH to pay unregistered finders; diverting the Partnership’s capital into the Redeployment Loan and Fourth Amendment for their own benefit; subordinating Plaintiff’s capital to the GP Advance; refusing his June 14, 2023 demand for its return; and debiting his account for fees and expenses, including within the past three years. Plaintiff has been damaged thereby and is entitled to punitive damages.

**COUNT XVI**
***Unjust Enrichment, Constructive Trust, and Accounting***
**(Individually and Derivatively, Against All Defendants Other Than Group 41)**

120. Plaintiff repeats and realleges paragraphs 1 through 81 above. To the extent the contracts at issue are void, rescinded, or do not govern, Defendants were unjustly enriched at the expense of Plaintiff and Group 41 by the Syndication Price, management fees, profit share, GP Advance interest, CMB Export’s loan fees, and expense reimbursements, each a separate enrichment. Because Defendants obtained this property in a confidential and fiduciary relationship, through promises of loyal management on which Plaintiff and Group 41 relied, equity requires restitution and a constructive trust over the property and its proceeds. Because Defendants are fiduciaries who have refused to disclose the Loss Allowance computation, the GP Advance

balance, CMB's fees, and the Senior Loan's status, and furnish capital account statements that cannot be reconciled with the Partnership's audited books (¶ 61), and Plaintiff has no adequate remedy at law, Plaintiff and Group 41 are also entitled to a full accounting since December 9, 2015.

## COUNT XVII
### *Civil Conspiracy*
### (Individually, Against All Defendants Other Than Group 41)

121. Plaintiff repeats and realleges paragraphs 1 through 81 above. Defendants agreed to commit the fraud, fiduciary breaches, and conversion alleged in Counts X, XII, and XV; each committed overt acts in furtherance of the agreement, including the acts attributed to it in paragraphs 84 and 104; and each participated intentionally for its own benefit. Each is jointly and severally liable for its co-conspirators' torts, and Plaintiff is entitled to damages and punitive damages.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and derivatively on behalf of Group 41, respectfully requests that the Court enter judgment against Defendants, jointly and severally:

a. Determining that the derivative claims are properly brought under Rule 23.1 and that demand is excused;

b. Rescinding the Subscription Agreement, LPA, and Escrow Agreement and awarding Plaintiff restitution of $550,000 less distributions received, with interest from the date of payment, or, at Plaintiff's election, rescissory damages;

c. Awarding Plaintiff and Group 41 compensatory, consequential, and rescissory damages in amounts to be proven at trial;

d. Rescinding and cancelling the GP Advance Obligation and ordering restitution and disgorgement of all fees, profit share, interest, and other compensation received by Defendants from Plaintiff or the Partnership;

e. Awarding Plaintiff treble damages under 18 U.S.C. § 1964(c);

f. Awarding punitive damages on Counts X, XII (to the extent permitted by applicable law), XIII, XV, and XVII;

g. Entering the declarations requested in Count IX;

h. Ordering a full accounting and imposing a constructive trust as requested in Count XVI;

i. Preliminarily and permanently enjoining Defendants from enforcing or paying any amount on the GP Advance; charging Plaintiff's or the Partnership's capital for fees, profit share, expenses, or their defense costs; soliciting additional capital without full disclosure; diluting or forfeiting Plaintiff's interest; and dissipating or encumbering Partnership assets outside the ordinary course;

j. Appointing a receiver or independent monitor for the Partnership, or removing the General Partner, as necessary to protect the Partnership's assets;

k. Directing that any derivative recovery be distributed so that Defendants do not share in it, including by pro rata distribution to the limited partners;

l. Awarding costs and reasonable attorneys' and expert fees under 18 U.S.C. § 1964(c) and the common-fund and substantial-benefit doctrines;

m. Awarding pre-judgment interest, including at nine percent per annum under CPLR 5001 and 5004 on the state-law claims, and post-judgment interest; and

n. Granting such other relief as the Court deems just and proper.

## X. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Submitted: November 23, 2026
New York, NY

Respectfully submitted,

**LAW OFFICES OF ROBERT V. CORNISH, JR., PC**

By: *<u>/s/ Jennifer L. Harrington</u>*
Jennifer L. Harrington, Esq.
Robert V. Cornish, Jr., Esq.
32 Mercer Street, 3rd Floor
New York, New York 10013
Tel.: (307) 264-0535
jharrington@rcornishlaw.com
rcornish@rcornishlaw.com
*Attorneys for Plaintiff*

**VERIFICATION**

I, Mehdi Dehghani, declare as follows:

I am the Plaintiff in this action. I have read the foregoing Verified Complaint. The allegations concerning me and my own acts are true to my own knowledge, and all other allegations are true to the best of my knowledge, information, and belief, based on the documents and information available to me and my counsel. I was a limited partner of CMB Colorado Infrastructure Investment Group 41, LP at the time of each transaction complained of and remain a limited partner today. This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 23 2026, at Marburg, Germany.

Mehdi Dehghani